<div style="margin-left:auto">CORNISH<br>vs<br>STRUTTON.</div>

---

CHANCERY.

## Cornish *vs* Strutton.

ERROR TO THE MERCER CIRCUIT.

*Vendor and Vendee. Waste. Rescission. Equity.*

*Case* 146.

September 25.

Case stated.

JUDGE BRECK delivered the opinion of the Court.

In 1835, Cornish sold Strutton three tracts of land, two of which contained about one hundred and twenty five acres each, and the third about fifty acres. Upon the tract last named, there were valuable mills, a grist mill and saw mill. This tract, in the sale, was estimated at $2,150, the other two tracts at $250, making the aggregate consideration $2,400. For the conveyance of the mill tract, Cornish gave his own obligation. He also gave his own obligation for the conveyance of one of the 125 acre tracts, and assigned a bond he held upon one Cunningham for a title to the other. The tracts all adjoined each other, part of the land lying in the county of Mercer and part in the county of Washington. Strutton having paid the purchase money, brought an action of covenant against Cornish, upon his obligation for a conveyance of the mill tract, alledging a failure to convey as therein stipulated. Cornish filed his bill in equity to enforce a specific execution of the contract, and obtained an injunction restraining Strutton from proceeding at law with his action of covenant. The termination of this suit in chancery was the dissolution

of the complainant's injunction, and the dismissal of his bill, absolutely, so far as he sought a specific enforcement of the contract of sale, and without prejudice in reference to any claim he might have for rent or waste.

Strutton then proceeded in his action at law and obtained a judgment for $3,149, but as this sum exceeded the damages laid in his declaration by $149, he.remitted that much thereof. After the judgment at law Cornish exhibited this bill in chancery, setting forth the foregoing facts, or most of them, and referring to the former suit and proceedings. He also alledges that the mills constituted the chief and principal value of the property in his sale to Strutton, being of the value of near $2,000. That the rent of the premises, while kept in the repair they were in when the. sale was made and Strutton obtained the possession, was worth $500, or more, per annum. That vast waste by omission, commission and negligence, had been done upon the premises—in the destruction of the mills by fire—in permitting other buildings and the fences upon the premises to rot down and decay. That the mill site had also been greatly injured for want of proper care and attention. That valuable timber had also been destroyed and immense quantities sawed up or permitted to rot. That the rent and waste committed would equal the judgment at law, obtained by the said Strutton, and for which he was then pressing the complainant.

The complainant also charges that Strutton was unable to pay the rent and damages for waste, unless by an off-set of his judgment. He, therefore, prays an injunction against the same, which was awarded him. He also sought a rescission of the entire contract with the defendant, or as to the other two parcels of land also.

The defendant, in his answer, denies that the mills had been destroyed through the negligence of himself or his agents. He denies that there had been waste in other respects as charged, and resists the claim for rent to the extent set up. He makes his answer a cross bill and prays that the $149 which he had released of his judgment at law, might be allowed and decreed him in discharge of any claim the complainant might establish.

for rent. That the sole inducement in making the re-lease was, to reduce his judgment to the amount of damages laid in the declaration. He also claimed $54, which he charged he had overpaid the complainant, of the purchase money for the land.

The prayer for a rescission as to the entire contract, as sought by the complainant, he did not resist.

Decree of the Circuit Court.

The Court below rescinded the contract as to all the land sold, and allowed the complainant for rent and waste and mill irons and timber taken by the defendant, $940, and after deducting from it the purchase money and interest for the land, other than the mill tract, cred-ited the residue, being $490 91, upon the defendant's judgment at law, and dissolved the injunction with dam-ages, as to the balance. As to the waste occasioned by the burning of the mills, the Court was of opinion that the defendant was not chargeable, but that the loss should fall upon the complainant. Each party was de-creed to pay his own costs.

To reverse that decree the complainant has brought the case to this Court, and the defendant also complains and assigns cross errors.

Whether the Court below was right in absolving the defendant from liability for the destruction of the mills and throwing the loss upon the complainant, presents the most important as well as the most perplexing ques-tion for consideration.

If destroyed through the culpable negligence, or for want of reasonable care and attention, on the part of the defendant or his agents, the loss should fall on him, otherwise upon the complainant, and the decree, in that respect, is right.

The liability of Strutton as ven-dee, to pay for the mills burned discussed upon the facts and de-cided against him—Held that as purchaser in possession, who negligently suf-fered the mills to be burned, he

The defendant obtained possession of the mills in Oc-tober, 1835, and they were burnt down about the first of April, 1837.

There is no contrariety in the testimony in regard to the position of the fire or the part of the mills where fires were usually made. It appears there was a base-ment story to the grist mill with no floor, or rather with a dirt floor. This story was about seven feet high and the place for the fire was upon the floor on one side,

against the underpinning, or a natural bank of earth, if the sill of the mill, which was a frame building, was supported by pillars, as some of the witnesses think it was. But whether the one way or the other, is not material, as all the witnesses concur, that the fire was kept or made upon the floor, against the wall or bank, under the sill. That there was no chimney but a hole or opening under the sill, for the smoke and sparks to pass out at. That from the fire, (we suppose when burning,) to the sill and floor above, was not more than four or five feet, and that the smoke and sparks, and even the flame or blaze sometimes came in contact with the sill and floor, and when passing out under the sill, with the weatherboarding upon the outside. That the sill, floor and weatherboarding had became very black, covered with soot and very dry from the effect of the fire. That the mill was in constant and imminent danger from the fire, kept in this way, there is but one opinion among the numerous witnesses, who testify upon the subject. But the safety of the mill was not only constantly endangered from the position of the fire, but by the reckless inattention in regard to it on the part of those to whom their management was entrusted. It is in proof, that the mills were sometimes left, and at night, with a large fire burning; and had actually taken fire on one or more occasions, before they were finally destroyed, although not at the usual place of keeping the fire. It moreover appears that the habits of the millers were irregular—that they often indulged freely in the use of ardent spirits—that there was frequently card playing and sometimes gaming at the mills, in which they participated. They were often cautioned about the fire, and told that the mills would be burnt unless they were more careful. · It was predicted by many, acquainted with the condition of things, that they would be burnt, and it seems to have been a matter of surprise to no one, when the burning took place. The marvel was that they were not burnt sooner.

The fire occurred between twelve and two o'clock in the afternoon of a Sunday, and when first discovered, was blazing up on the weatherboarding, directly above

CORNISH
vs
STRUTTON.

was responsible to his vendor for the loss, upon a rescission of the contract.

the opening under the sill, made or left for the smoke and sparks to pass out from the fire within.

From this view of the testimony, the presumption would be violent, if not conclusive, that the fire or burning, was the result of gross and culpable negligence on the part of the defendant and his agents. Other facts and circumstances in the record, might also be referred to, strongly tending to sustain such a conclusion.

The question then arises, whether this presumption is successfully repelled by other testimony in the case. We think it is not.

The state of things about the mills, in reference to fire, on the night and morning before the burning, rests upon the testimony of three witnesses; one the son of the defendant, and who was at the time, and previously, engaged as a miller, and the other two, persons who went to the mills on the evening before, with grain to be ground.

In the testimony of these witnesses, whose depositions were several times taken, there is some confusion and contrariety; all concur that there was no fire in the mill, except a candle, on the night before the burning, but they differ somewhat upon the question whether there was a fire the next morning.

We think, however, it satisfactorily appears, in view of all their testimony, that a fire was actually made, and if not, that an attempt was made, by bringing fire and splitting up plank and putting it upon it to make one. Whether it had been made and burnt down when all parties left the mill about 9 o'clock in the morning, or whether the split plank put upon the fire had not at that time caught or been ignited, does not very clearly appear. It is to be inferred from the testimony of Strutton, in one of his depositions, that the latter was the case, and that he supposed the fire had gone out. But whether the fact was the one way or the other, is not very material. It is very evident that there was fire in the mill only a few hours before it was discovered on fire. That a fire was actually made, or attempted to be made in it, and in a place which greatly exposed and endangered it. The proof is conclusive, that the danger

had become much more imminent from the increased dryness of the sills, the floor above, the weatherboarding and the soot, which had collected about them. Although the fire may have apparently gone out below, when the party left the mill in the morning, as was supposed, yet it may have been communicated to the wood or soot above, and afterwards fanned by the wind, as it appears to have been a windy day, into a flame; or the fire may not have gone out, upon which the split plank was put, but may afterwards have been communicated to it. We are not inclined to the opinion that a very critical or careful examination was made in regard to the fire on that morning. Such a presumption is by no means authorized from the previous habits of Strutton as a miller. And he and the other witnesses only say they examined and saw no fire, or there was no fire.

It is true, an effort is made by the defendant to show that the fire was the work of an incendiary, but we think it has by no means been successful. He proves that there had been, and was at the time, ill feeling between the defendant and two of the brothers of the complainant, who resided not far from the mill. But the testimony is not deemed sufficient, in view of all the circumstances, to raise even a suspicion against them. The very time when the fire appeared, would seem to forbid the idea that it was the act of an incendiary. It appeared at noon day, and precisely at that part of the building most exposed from the fire within, and where there had been fire only a few hours before.

In view of the whole case then, we think the fair inference is, that the destruction of the mills resulted from the want of reasonable care and attention on the part of the defendant, and consequently, that he should be held responsible for the loss.

In determining the amount for which he should be charged, we have had some difficulty; but in view of all the circumstances, we have come to the conclusion, that $1,400 will be a reasonable allowance to complainant, as that sum will probably cover the expense of rebuilding, or nearly so. And as the defendant is to be charged with this sum for waste in the destruction of

The value of the mills burned estimated at 1,400 dollars.

Strutton not to be chaiged with mill irons, and to be allowed $149, part of the judgment at law remitted. The complainant coming into a Court of equity and asking equity must do equity.

The claim of Strutton for $54 not sustained.

the mills, he will not be charged with the $80 for the mill irons.

We are of opinion the defendant should be allowed the $149 of his judgment, which he remitted. The complainant comes into a Court of equity for relief, and of course should be required to do equity. The release was made without any consideration moving from the complainant. And as he now asks a rescission of the whole contract, and claims damages for waste and rent, it is but equitable the defendant should be allowed the purchase money paid by him, and interest, and which he will not obtain unless the $149 is allowed him.

In regard to the $54 claimed by the defendant, we think the Court below was right in not allowing it. It is true the answer of the complainant to the cross bill of the defendant, in which he denies the allegation as to this claim, was not regularly noted upon the order book as filed; but it was sworn to before the clerk and filed among the papers of the suit before the last term preceding the one at which it was tried. It was no doubt read upon the trial as part of the record, and we are inclined so to regard it. It denies the claim of $54, and there being no proof to establish it, the Court was right in rejecting it.

We are of opinion the Court below erred in assuming the consideration for the land, other than the mill tract, to be $259 50. It is alledged and admitted, that the consideration of the three tracts was $2,400, and that the mill tract, with the improvements, was estimated at $2,150. This would leave the consideration of the other two $250 instead of $259 50. Moreover, only $2,400 had been paid, if the claim for $54 is rejected, as we think it should be.

Except in the particulars indicated, we think the decree is right.

The amount to which the complainant will be entitled, according to the principles of this opinion, will be applied as a credit upon the judgment as a credit of the date thereof. And as to the residue of the judgment, the injunction will be dissolved, with damages.

The cross errors are not deemed available, except so far as they have already been considered and disposed of.

The decree is reversed, and the cause remanded, that a decree may be rendered as herein indicated. And Cornish is entitled to his costs in this Court.

*Daviess and Taylor* for plaintiff; *B. & A. Monroe and Trapnall* for defendant.